UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00024

SHAWN JACKSON                                                                                    Plaintiff

v.

SIGMA PI FRATERNITY INTERNATIONAL INC., *et al.*                            Defendant

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Plaintiff Shawn Jackson's motion styled, "Plaintiff's Civil Rule 59 and Civil Rule 60 Motion to Alter, Amend, Correct and/or Set Aside the Court's Judgment – Order of August 24, 2012." (Docket No. 25.) Defendants Sigma Pi Fraternity International Inc. and Gamma Upsilon of Sigma Pi (collectively Defendants) have responded. (Docket No. 26.) Plaintiff has not replied, and the time for such reply has now passed. This matter is now ripe for adjudication. For the reasons that follow, Plaintiff's Motion, (Docket No. 25), is DENIED.

BACKGROUND

The underlying action arose from a party hosted on February 19, 2010, by the Gamma Upsilon Chapter of Sigma Pi (Chapter) at Murray State University (MSU). During that party, Plaintiff, an African American, was ejected from the festivities. He alleges, among other things, that members of the fraternity violated his constitutional rights in doing so.

Plaintiff was enrolled at MSU during the spring semester of 2007 continuing through fall 2009. He stated in his deposition that he could not recall whether he was enrolled during the spring semester of 2010. (*See* Docket No. 25-2, at 12.) In the days leading up to the party, its organizers advertised the event to MSU students on the social networking site Facebook. The invitation indicated the date and time of the event, its location, and the cost of attending. The invitation also enumerated a list of conditions for entry, including:

> ALL MSU SOCIAL POLICIES APPLY!!!
>
> &gt;You must have your MSU ID with the M# in order to get in.
> . . . .
> &gt;We have the right to deny anyone entry (We will be limiting entry!!!)
> . . . .
> &gt;&gt;&gt;REMEMBER! FRATERNITY PARTIES ARE A PRIVILEGE FOR US AND ALL OTHER GREEK ORGANIZATIONS!!! WE WILL NOT TOLERATE DISRESPECT TOWARDS THE UNIVERSITY POLICIES OR US! DOING SO WILL RESULT IN YOUR EXPULSION FROM THE PARTY AND FUTURE PARTIES!

(Docket No. 15-1; *see also* Docket No. 17.) These restrictions were supplemental to MSU's Greek Social Policy, which required that all attendees of Greek-sponsored events be issued and wear wristbands to designate his or her age.

Plaintiff learned of the party on Facebook and notified its organizers through the website that he would attend. He attended the party with his cousin, Antonio Jackson (Antonio), and Antonio's step-sister, Cindy. Upon arriving at the party, Plaintiff paid his and Antonio's entrance fee. (*See* Docket No. 25-2, at 26.) Antonio and Cindy received

wristbands upon entering, but Plaintiff did not. Antonio states in his affidavit: "Some individuals were given a wristband, and some were not. There were some entering who did not get a wristband. I did." (Docket No. 25-1, at 2.) Shortly after arriving, Plaintiff proceeded to purchase two beers from someone who he thought, but was not sure, was a member of the Chapter. (Docket No. 25-2, at 26.) In his deposition, Plaintiff acknowledged that the party's hosts maintained a list of printed names of invitees and that entrants were required to sign by their name upon arrival. (Docket No. 25-2, at 27.) When asked in his deposition whether he "agree[d] . . . that the party would not have been generally open to the general public," Plaintiff responded, "I would . . . the party wouldn't be generally open to the general public." (Docket No. 25-2, at 37.)

Roughly 45 minutes after arriving at the party, Plaintiff was approached by a "really drunk guy," asking, "Where the F is your wristband?" (Docket No. 25-2, at 40.) Plaintiff responded, "Man, what's wrong with you? . . . Don't be putting your hands on me." (Docket No. 25-2, at 40.) Plaintiff then suggested that the two move their conversation toward the entrance, which they did. (Docket No. 25-2, at 40.) Plaintiff conferred with the hosts at the door to whom he paid his entrance fee to, stating in his deposition: "I believed that they told him, and they know that they -- that I paid my way in. They should have gave me a wristband then, but, obviously, they didn't. And all of it would have been over if they would have just give me a wristband because all of them just said that I just paid my way in." (Docket No. 25-2, at 41.) Plaintiff states the drunken partygoer then tried to fight him and repeatedly ordered him to leave. (*See* Docket No. 41-44.) Another attendee restrained the drunken partygoer, and then,

according to Plaintiff, "I guess they must have talked it over and so all of them told me I would have to leave." (Docket No. 25-2, at 44-46.) Specifically, Plaintiff recalls, "I don't know who it was, but it was like is seven or eight people that told me I had to leave. . . . They told me that I would have to -- they just told me that I would have to leave the -- that I would have to leave the party." (Docket No. 25-2, at 47.)

Around that time, Plaintiff again encountered the drunken partygoer, who repeated his inquiry as to the whereabouts of Plaintiff's wristband. (*See* Docket No. 25-2, at 48.) While exiting the property, Plaintiff heard "two or three people" saying, "[G]et the F out of here," and yelling racial slurs. (Docket No. 25-2, at 49-50.) According to Plaintiff, Antonio and Cindy were still inside the party. (Docket No. 25-2, at 50.) As he was walking away, Plaintiff felt "two or three rocks . . . hit [him] in [his] left leg." (Docket No. 25-2, at 50.) Antonio states in his affidavit that he saw "at least one individual throw a rock" and heard the racial slurs being yelled. (Docket No. 16-1.) Plaintiff then walked home alone and does not recall Antonio returning home until 4:00 or 5:00 a.m., or possibly even 8:00 a.m. the following morning. (Docket No. 25-2, at 53.)

In his present Motion, Plaintiff asserts that "[t]here are several factual inaccuracies referred to in the court's recited background in the Opinion," which, in light of Plaintiff's deposition testimony,[1] "should clearly convince this court that the ultimate decision should be altered and amended accordingly." (Docket No. 25-1, at 2.) Plaintiff essentially raises six arguments: (1) in regard to his claim under 42 U.S.C. § 1981, the

---

[1] In its prior Opinion, the Court noted that although the parties relied heavily on Plaintiff's deposition testimony in their motions, neither party attached the transcript as an exhibit, and so, the Court previously relied on the parties' summaries of that testimony. (Docket No. 23, at 2 n.2.)

Court incorrectly found (a) that Plaintiff "was removed because he lacked a wristband, not because he was an African American" and (b) that the ejection and subsequent racial slurs were part of the same transaction; (2) in regard to his claim under 45 U.S.C. § 1985, the Court erred in finding he failed to set forth a cognizable claim that Defendants engaged in a conspiracy to infringe upon his constitutional rights; (3) in regard to his claim under the Kentucky Human Rights Act (KHRA), Ky. Rev. Stat. § 344.120, the Court mistakenly found that the party was closed to the public; (4) in regard to his outrage claim, the Court erred in dismissing his claim by relying on cases where the conduct fell short of "the high level of racial discrimination" present here; (5) that he should be allowed to recover damages, pursuant to Ky. Rev. Stat. § 446.070, for the Chapter's alleged violation of state alcohol laws; and (6) that the Court erred in dismissing his suit against the unknown members of the Chapter and other unnamed defendants. Although Plaintiff brings the present Motion under Federal Rule of Civil Procedure 59(e) as well as Rules 60(b)(1) & (6) and 60(d), the Court finds that because Plaintiff timely filed his Motion under Rule 59(e), a motion under that Rule is the proper vehicle for the relief Plaintiff seeks; therefore, the Court need not consider the more stringent requirements for setting aside a judgment under Rule 60.

## STANDARD

"A motion to alter or amend judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). A Rule 59 motion should not be used to reargue a case on the merits. *See Whitehead v. Bowen*, 301 F. App'x 484, 489 (6th Cir. 2008) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374

(6th Cir. 1998)). Instead, "[u]nder Rule 59, a court may alter or amend a judgment based on: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). "A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion . . . ." *Id.*

## DISCUSSION

Plaintiff's present Motion essentially rests on the premise that the Court previously failed to consider certain exhibits—namely, Antonio's affidavit, the Facebook invitation, and Plaintiff's deposition testimony (which was first provided to the Court as an exhibit to the present Motion). First, despite not expressly citing the previously submitted exhibits (*i.e.*, Antonio's affidavit and the Facebook invite), the Court nonetheless considered them, and the Court's prior Opinion in this matter reflects that consideration. And second, despite not reviewing the entirety of Plaintiff's deposition testimony (which had not been submitted), the Court relied wholly on the parties' summaries of that testimony. Now, after having reviewed the entire deposition transcript, the Court is all the more satisfied that its prior conclusions are correct.

Although Plaintiff's argument is couched in terms of the Court having overlooked certain evidence in granting summary judgment, ultimately, Plaintiff's Motion does no more than rehash the same arguments already presented that were previously considered and rejected by the Court. "A motion under Rule 59(e) does not simply provide an opportunity to reargue a case, and it must be supported either by a showing that the

district court made an error of law or by newly discovered evidence." *Whitehead*, 301 F. App'x at 489. Plaintiff presents neither "newly discovered evidence," nor establishes "a manifest error of law." The Sixth Circuit's reasoning in *Whitehead* is directly on point here: "Even if [Plaintiff's deposition testimony] were sufficient to create a genuine issue of material fact, it merely sets forth his own account of the events . . . and was, at best, newly *submitted* evidence, not newly *discovered* evidence." *Id.* Therefore, after considering Plaintiff's deposition testimony and again considering Antonio's affidavit and the Facebook invitation, the Court remains convinced that summary judgment was appropriate.

### I.     42 U.S.C. § 1981

Plaintiff argues he is entitled to relief from the Court's dismissal of his § 1981 claim because the Court erroneously found that he was removed from the party because he lacked a wristband, not because of his race, and that his ejection and the subsequent racial insults hurled at him did not constitute one and the same transaction. The Court disagrees.

In regard to the wristband issue, Plaintiff cites Antonio's affidavit (which Plaintiff asserts was previously overlooked by the Court) to (1) establish the fact that "[s]ome individuals were given a wristband and some were not" and (2) conclude that he has presented incontrovertible evidence that no proof exists to show that "any other individual was ordered to leave the premises because he or she did not have a wristband." (Docket No. 25-1, at 2-3.) The Court is unpersuaded by this argument for several reasons. First, even accepting Antonio's and Plaintiff's accounts as true, Plaintiff fails to

establish a logical link between the fact that some attendees may have not been given wristbands and why he was necessarily ejected because of his race and not because he lacked a wristband. Neither Antonio's nor Plaintiff's statements identify any other attendees who were admitted without a wristband, and neither establish that either the drunk partygoer who first confronted Plaintiff or the other hosts who eventually asked Plaintiff to leave had any knowledge of other attendees not having wristbands. Moreover, Plaintiff's cousin Antonio—who is also African American—had a wristband and remained at the event without incident.

Second, as the Court previously pointed out and as a complete review of Plaintiff's deposition confirms, his expulsion from the party clearly originated and occurred because of his lack of a wristband, not because of his race. Plaintiff's testimony establishes that he was initially confronted by the drunken partygoer because he lacked a wristband:

> And [the drunken partygoer] asked me, he was like, Where the F is your wristband?
>
> I'm like, Man, what's wrong with you? You know what I'm sayin? Don't be putting your hands on me. You know what I'm saying?
>
> He -- Where the F is your wristband? And he was like -- he started getting loud.
>
> And I was like, Let's just go to the front, to the entrance. He walks behind me to the entrance. And we get up to the entrance, and they actually tell him -- they was like, well, he paid his way in -- you know what I'm sayin' -- but we didn't give him no wristband.

> And at that time -- you know what I'm sayin' -- I believed that they told him, and they know that they -- that I paid my way in. They should have gave me a wristband then, but, obviously, they didn't. *And all of it would have been over if they would have just give me a wristband because all of them just said that I just paid my way in.*

(Docket No. 25-2, at 40-41 (emphasis added).)

Next, in regard to the timing of the events, Plaintiff argues that his deposition testimony establishes that his ejection from the party and the subsequent discriminatory remarks constituted one transaction. Specifically, Plaintiff posits:

> It would defy common sense built up over the years to discount the fact that the fraternity brothers, who decided among themselves that [Plaintiff] had to leave, did not have racial animus in their minds when they discussed this fact. [Plaintiff] didn't hear the discussion, but if in fact, as [Plaintiff] indicates, within second of being told to leave, he was subject to racial slurs and hit by rocks, that a decision by the fraternity brothers to kick him out was not based upon their racial animus. Are we to believe that at 5:00 p.m. on a given day, these fraternity brothers had no racial bone in their body or were members of the Civil Liberties Union of the NAACP, but then at 5:01 or even less than sixty second later, they threw racial slurs at [Plaintiff] and threw rocks at him. Generally, people who are always nice are always nice, and those who are always mean are always mean.

(Docket No. 25-1, at 3-4.) This argument does not persuade the Court that it's prior decision, which relied on the reasoning of the Eleventh Circuit in *Kinnon v. Arcoub, Gopman & Assoc. Inc.*, 490 F.3d 886 (11th Cir. 2007), was erroneous in this regard. Moreover, this argument offers no valid basis to justify vacating the Court's prior grant of summary judgment. If a contract was formed by Plaintiff paying an entry fee, any

contractual relationship that existed was based on that "single, discrete transaction." *See Kinnon*, 490 F.3d at 892 (finding that the "contractual relationship [formed by a retail sales contract] is based on a single, discrete transaction"). As Defendants point out, Plaintiff has offered no evidence, either previously or now, to establish a connection between the decision to terminate any contract that might have existed by ejecting him from the party and the subsequent actions by whoever yelled racial remarks and/or threw rocks at him. Plaintiff's testimony evinces no racial animosity or motive by either the drunken partygoer or the hosts who ejected Plaintiff at the point in time they asked him leave. The Court is satisfied that at the moment he was ejected, whatever contract might have existed was terminated. No continuing contractual relationship existed thereafter. Accordingly, as the Court previously found, Plaintiff has not established that his ejection from the party and the subsequent actions by the crowd were one and the same transaction.

In sum, Plaintiff's testimony expressly affirms the conclusion that that his expulsion was founded upon his failure to secure a wristband. He offers no evidence connecting the decision to eject him from the party with the subsequent racial slurs and thrown rocks, nor has he shown that those unseemly remarks establish pretext for his ejection. In addition, Plaintiff does not contest the other reasons set forth in the Court's prior Opinion that also formed the bases for dismissing this claim. Therefore, after reviewing Plaintiff's deposition testimony and again reviewing Antonio's affidavit, the Court finds nothing to warrant altering or vacating its prior grant of summary judgment on Plaintiff's § 1981 claims.

## II. 42 U.S.C. § 1985

Plaintiff essentially reargues that the drunken partygoer's actions combined with the hosts' decision to eject him and the fact that some members of the crowd subsequently yelled racial insults and threw rocks at him somehow, in the aggregate, established a conspiracy to deprive him of his constitutional rights. Plaintiff contends that the four requisite elements for a § 1981 claim are proven, reasoning that "[he] had a right to be at the party, and two or more fraternity members caused injury to him by terminating the contract and telling him to leave, and on top of that, he was hit by rocks thrown by fraternity brothers." (Docket No. 25-1, at 4.) As before, the Court finds Plaintiff's rationale unpersuasive. Plaintiff's conclusory allegation that two or more fraternity members discussed the issue and then asked him to leave the party continues to fall short of linking any alleged conspirator to a conspiracy to deprive him of his civil rights. *See Amadusa v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008). The Court is satisfied that its prior reasoning on this issue remains sound, even considering Plaintiff's deposition testimony in full, and, thus, Plaintiff has failed to construct a cognizable claim for relief under § 1985.

## III. Kentucky Human Rights Act

Plaintiff suggests that "the court, due to mistake or inadvertence," somehow overlooked his previously submitted exhibit depicting the Facebook event and invitation for the party. Although the Court did not expressly cite the attached exhibit, the Court clearly discussed the content of that invitation in its prior Opinion. (*See* Docket No. 23, at 11.) Plaintiff reasserts, as he did in responding to Defendants' motion for summary

judgment, that the fraternity party was open to the public and, therefore, subject to the public-accommodation provision of the KHRA, Ky. Rev. Stat. § 344.120. The Court previously found that the party was not open to the public because the invitation was available only to those who possessed a Facebook account and expressly limited attendance to those possessing valid MSU student IDs. Plaintiff now insists that the event was open to the public because the "Event Type" was designated as an "open event," reasoning, "If that doesn't make it an event open to the public, then nothing will." (Docket No. 25-1, at 5.) Again, the Court disagrees.

The Court is not persuaded that a Facebook invitation's status as an "open event" somehow transforms it into one "open to the general public." The invitation to the event is still limited in distribution to registered Facebook users. More importantly, under the "Description" section, the event's invitation listed a number of restrictions and conditions in all-capital lettering, including that (1) all university policies apply, (2) attendees must have a valid MSU student ID to get in, and (3) the hosts reserve the right to deny entry to anyone. (Docket No. 15-1, at 1.) The invitation further notes that these parties are a "privilege." (Docket No. 15-1, at 1.) And, remarkably, in the very deposition testimony that Plaintiff suggests "should clearly convince this court that the ultimate decision should be altered, amended, corrected or set aside," Plaintiff expressly testified that the party was *not* open to the general public:

> Q: You would agree with me that the party would not have been generally open to the general public?
>
> A: I would -- as the Facebook page -- as the Facebook page

> looks -- you know what I'm sayin' -- the party wouldn't be open to the general public. . . .
>
> Q: Would it be fair to say that it was not intended to be open to the general public, but there were certain ways that people can always --
>
> A: Yes.
>
> Q: -- get into a party that's sponsored by a fraternity? Is that--
>
> A: Yes
>
> Q: Okay. Much like Antonio was able to get in?
>
> A: Yes.

(Docket No. 25-2, at 37-38.) Accordingly, the Court reaffirms its conclusion that the event was not open to the public and, thus, not subject to the KHRA.

### IV. Outrage

Plaintiff faults the Court's dismissal of his outrage claim as relying on cases that fall short of what he characterizes as "the high level of racial discrimination" here. (Docket No. 25-1, at 6.) As the Court previously noted, Kentucky courts have "set a high threshold for outrage claims," *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 791 (Ky. 2004), stating that "a claim for the tort of outrage requires the plaintiff to prove conduct which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community,'" *Humana of Ky. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965)). "It is for the court to decide

whether the conduct complained of can reasonably be regarded as so extreme and outrageous as to permit recovery." *Goebel v. Arnett*, 259 S.W.3d 489, 493 (Ky. Ct. App. 2007) (citing *Whittington v. Whittington*, 766 S.W.2d 73 (Ky. Ct. App. 1989)).

In its prior Opinion, the Court noted that Plaintiff "provides no evidence that he has suffered emotionally or otherwise from the events at the fraternity party." (Docket No. 23, at 13.) After reviewing the full transcript of Plaintiff's deposition, the Court now acknowledges Plaintiff's testimony that he received counseling because of the incident at the party. (*See* Docket No. 25-2, at 75-76.) The Court also acknowledges Plaintiff's statements that he has "trouble being around Caucasian or white people" and that he has had dreams of being beaten up by white people. (Docket No. 25-2, at 75.) Nonetheless, the Court is not dissuaded that the conduct complained of in this case fails to satisfy the high bar for outrage claims in Kentucky.

Despite complaining that the Court relied upon a litany of less outrageous factual scenarios in which Kentucky courts have refused to entertain a claim for outrage, Plaintiff cites no case law or other authority to support his conclusion that the facts of this case are distinguishably more outrageous than those in the cases relied upon by the Court. (*See* Docket No. 25-1, at 5-6.) Regardless, the Court has since located a Kentucky decision addressing an outrage claim based on racially disparaging remarks that unequivocally supports this Court's prior decision. In *Wilson v. Lowe's Home Ctr.*, an African-American man employed by Lowe's "alleged that he had been subjected to extreme racial remarks, verbal abuse, intimidation, and harassment nearly every day beginning shortly after he started working in 1991 and continuing until his transfer to a new store in 1999." 75

S.W.3d 229, 230 (Ky. Ct. App. 2002). He brought his concerns regarding these remarks to both his supervisors (who were some of the individuals responsible for making them) as well as other management personnel; however, the racially discriminatory conduct continued despite his complaints. *Id.* The *Wilson* plaintiff testified that racial comments "were made almost every day by the three individual store managers and by other employees in his presence." *Id.* at 238. The Kentucky court found that the plaintiff could maintain a claim for the tort of outrage based on those facts. *Id.* The court reasoned that, assuming his allegations were true, "he was subjected to racial remarks on nearly a daily basis by his coworkers and supervisors for a period of approximately seven years." *Id.* In a footnote immediately following that statement, the court explained its conclusion:

> The facts of this case are distinguishable in this regard from the facts in *Seitz*, the case upon which the trial court relied. The callous and insensitive remarks of the hospital personnel in *Seitz* occurred during only one short incident and were not part of a "pattern of conduct." In the case *sub judice*, however, the offensive conduct allegedly occurred on a regular basis for approximately seven years.

*Id.* at 238 n.9.

The Kentucky Court of Appeals' decision in *Wilson* leaves no doubt that this Court correctly dismissed Plaintiff's outrage claim based on the facts presented. A complete review of Plaintiff's deposition testimony does not alter that conclusion. Here, assuming his allegations are true, Plaintiff was certainly the victim of reproachable behavior when, after being ejected from the party, members of the crowd yelled racial slurs and threw rocks at him. However, this conduct lasted but a few moments in

duration and was over. In light of the Kentucky court's decision in *Wilson*—where it explicitly distinguished racially offensive conduct that occurred almost daily for seven years from conduct that occurred only during a short incident and was not part of a "pattern of conduct"—this Court is satisfied that the facts here, even when viewed in a light most favorable to Plaintiff, do not support a claim for outrage under Kentucky law.

### V. Miscellaneous Claims Regarding the Sale of Alcoholic Beverages

Plaintiff maintains that under Ky. Rev. Stat. § 446.070 he is entitled to recover damages for the Chapter's alleged violations of Kentucky alcohol laws. (*See* Docket No. 25-1, at 7-8.) He asserts that section 446.070: "provides that one can recover damages for violation of a statute. This is particularly true if the statute does not provide a recover for damages." (Docket No. 25-1, at 8.) However, Plaintiff offers no valid basis upon which to vacate the Court's prior grant of summary judgment on these claims. In granting summary judgment, the Court concluded that even if it were inclined to entertain a personal cause of action for alleged violations of Kentucky alcoholic beverage criminal and licensing statutes, "this claim was not set forth in [Plaintiff's] complaint" but instead was presented for the first time in his response to Defendants' motion for summary judgment. Therefore, as the Court previously concluded, these claims need not be considered at this late stage in the litigation. (*See* Docket No. 23, at 14 (citing *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 n.4 (6th Cir. 1999) (refusing to consider unpled legal theory asserted for the first time in response to motion for summary judgment); *Gomez v. LSI Integrated LP*, 246 F. App'x 852, 854 (5th Cir. 2007) (declining

to consider a claim that was not pursued by litigant before summary judgment response)).)

### VI. Miscellaneous Claims Regarding Unknown Chapter Members

Plaintiff reasserts that he is entitled to maintain his action against Ryan McGillis, a Chapter member, as well as all unknown Chapter members and the Sigma Pi Housing Corporation. (*See* Docket No. 25-1, at 8-9.) The Court previously concluded that although Plaintiff: "brought suit against the unknown members of the [Chapter] in his complaint, he has failed to connect any individual with the events of February 20, 2010. He has not moved to amend his complaint to include individual defendants and the Court's scheduling order required him to do so by December 15, 2011." (Docket No. 23, at 14.) Plaintiff insists: "[N]ow, the Defendants' Document 22-2 informs us at this late date who some of the members are. But it was not filed until August 21, 2012, just a few days ago. We now have four of five defendant members who are now known and should be added as party defendants . . . ." (Docket No. 25-1, at 9.) Plaintiff's position is untenable and borders on the disingenuous for several reasons. First, as early as September 2011, the names of several Chapter officers and members believed to have knowledge of the event were provided to Plaintiff in Defendants' initial Rule 26 disclosures. (*See* Docket Nos. 13; 26, at 9.) Second, Defendants served their responses to Plaintiff's interrogatories and requests for production in February 2012—more than four months prior to the filing of Defendants' motion for summary judgment—in which they provided Plaintiff the full roster of Chapter members from fall 2009 through spring 2012. (*See* Docket No. 26-1, at 1, 13-19.) Yet Plaintiff took no action to amend his

Complaint to name any individual defendant before the Court's December 15, 2011, deadline nor has taken any such action since. Therefore, the Court cannot accept Plaintiff's averments that the identities of these unnamed individuals have only recently been discovered.

Additionally, Plaintiff's argument that Ryan McGillis should be made a party because he was served a summons directed at "All unknown members and officers of Gamma Upsilon of Sigma Pi Fraternity" is without merit. McGillis was not served in his individual capacity nor was named as a party. Plaintiff has also failed to convince the Court why he should be allowed to proceed against the Sigma Pi Housing Corporation. He cites no statutory or case law to support a cognizable claim against the Housing Corporation. Therefore, the Court is not persuaded to reinstate Plaintiff's claims against Ryan McGillis, the unnamed Chapter members, or the Housing Corporation. Plaintiff did not filed an amended complaint by the deadline this Court set; thus, the Court is not now inclined to allow him to now proceed against these unnamed defendants.

And finally, Plaintiff asserts that the affidavit of Leslie Alverson, the Chapter's faculty advisor, in which she states that the Chapter did not sell alcohol at the February 19 party, somehow "shows a clear issue of fact between an employee of the University and [Plaintiff] as to whether [Plaintiff] purchased two beers as he testified." (Docket No. 25-1, at 9 (referencing Docket No. 22-1).) The Court is unclear as to the precise relevance of this argument in the context in which Plaintiff presents it; however, in light of the Court's reaffirmed conclusion that Plaintiff cannot maintain a cause of action for alleged alcoholic beverage statutory violations, the Court finds nothing here to justify

Plaintiff's requested relief from summary judgment. *See Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996) ("[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.").

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's Motion to Alter, Amend, Correct and/or Set Aside the Court's Judgment – Order of August 24, 2012, (Docket No. 138), is DENIED.

Date:

cc: Counsel

.